FILED
JUN 29 2017
PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

WMG

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:17-CR-36-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL INFORMATION |
| | ) | |
| SHEPHARD LEE SPRUILL, II | ) | |

The United States Attorney charges that:

I. STATUTORY AND REGULATORY BACKGROUND

A. GENERAL BACKGROUND ON MEDICAID

1. Medicaid is a federal health care benefit program that helps pay for reasonable and medically necessary services for enrolled individuals, referred to herein as "beneficiaries." Medicaid is administered by state governments. In North Carolina, Medicaid is administered by the North Carolina Division of Medical Assistance (DMA). The Medicaid program and DMA are collectively referred to herein as "Medicaid." Medicaid pays for covered medical services of its beneficiaries, who are generally low income individuals.

2. If qualified, individuals can enroll to become Medicaid beneficiaries. At the time of enrollment, a beneficiary receives

1

a unique alphanumeric code that is issued by the program. This code is known as a Medicaid Identification Number. Similar to traditional insurance, beneficiaries may use their Medicaid Identification Numbers to receive covered medical services.

3. Medicaid beneficiaries receive services from medical practitioners and companies referred to as Medicaid "providers." Once a provider enters into a contract with Medicaid, the program issues a unique number to the provider, known as the "provider number." Providers must also obtain a federal identification number, known as National Provider Identifier, or "NPI" number. All Medicaid providers must certify that they will only bill the government for services that they actually render.

4. After a provider renders a covered medical service to a Medicaid beneficiary, the provider may bill Medicaid for the reasonable and necessary costs of the service. To bill Medicaid, providers generally send an electronic claim to a processor for the program. Providers may also hire billing companies or contractors to perform the task of submitting claims to Medicaid for payment; however, the provider is responsible for ensuring that the programs are only billed for services that the provider actually renders.

5. In each claim transmission, the provider must enter

2

truthful information concerning the services it performed. The claim transmission generally includes, but is not limited to, the date of the alleged service, the Medicaid Identification Number of the beneficiary, the nature of the service rendered, and the provider number. Providers are not required to send in copies of medical records or other forms of proof to justify the claim. The electronic claim is generally all that is required to receive payment from Medicaid.

6. While Medicaid claim processors may reject a claim if, for example, the provider or beneficiary is not enrolled, claim processors do not generally contact the beneficiary or provider before payment is made to confirm that the billed services were actually provided. They also do not typically review medical records or other underlying documentation to substantiate the billed services. Instead, Medicaid presumes the truth of each claim, and generally pays providers for the services that they bill. In other words, Medicaid entrusts its providers to only submit claims for the services that they actually perform.

7. Although Medicaid does not generally scrutinize claims before payment, both programs retain the right to audit providers after payment has been made. As such, providers are obligated to retain original source records, such as medical records, charts,

3

or other documents, that tend to show the nature of the services actually rendered by the provider. In the event that Medicaid agents discover that an electronic claim is not supported by the underlying documentation, the program may recoup those funds from the provider, or impose other sanctions.

    B.    COVERAGE FOR OUTPATIENT BEHAVIORAL HEALTH SERVICES

    8.    Some of the services covered by Medicaid include Outpatient Behavioral Health Services ("OBHS"). OBHS include assessment, individual and group therapy, family therapy, psychiatric medication management, and psychological testing for recipients of all ages.

    9.    Each provider of OBHS is required by Medicaid to maintain service notes and other medical records for a period of five years in order to document and substantiate any reimbursement requested from Medicaid. Not only are the service notes a requirement under Medicaid policy, they are necessary to ensure that these recipients receive the care that the Medicaid funds are designated to provide, by giving an account of the efficacy of the individualized plan of care.

    10.    For OBHS, the minimum documentation requirement is a full service note for each date of service, written and signed by the clinician who provided the service. Medicaid policy requires

4

that service notes include the following:

- Patient name
- Service record number
- Medicaid identification number
- Service provided
- Date of service
- Place of service
- Type of contact (face-to-face, telephone call, collateral)
- Purpose of the contact (tied to the specific goals in the plan)
- Description of the provider's interventions
- Amount of time spent performing the service
- Description of the effectiveness of the interventions in meeting the recipient's specified goals as outlined in the individualized plan of care.
- Signature and credentials of the clinician providing the service.

### C. COVERAGE FOR MEDICAID PROGRAM CODE 99215

11. Medicaid Providers are permitted to bill for Outpatient Health Services ("OHS") only where certain objective criteria have been met. Medicaid requires providers to adhere to the Current Procedural Terminology ("CPT") codes to determine whether these objective criteria have been met prior to billing Medicaid for OHS.

12. One form of OHS covered by Medicaid in qualifying circumstances is CPT Code 99215, which pertains to the evaluation of an established patient. To bill Medicaid for the services identified by Code 99215, at least two of three objective components must have been satisfied:

5

- A comprehensive history was undertaken;
- A comprehensive examination was undertaken;
- The service included medical decision making of high complexity.

13. Under Code 99215, counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies must be provided consistent with the nature of the problem(s) and the patient's and family's needs.

14. When billing for Code 99215, the patient typically presents with problems(s) of moderate to high severity. Typically, forty minutes are spent face-to-face with the patient and or family.

15. For Medicaid coverage to apply, only a physician or qualified health care professional can render the services described by CPT 99215.

II. FACTUAL BACKGROUND

A. GENERAL ALLEGATIONS

16. During times material to this Information, SHEPHARD LEE SPRUILL, II was an individual who operated a mental and behavioral health services company, known as Carolina Support Services (CSS). CSS provided behavioral health services to children in various counties within North Carolina, including counties within the Eastern District of North Carolina. CSS was a Medicaid provider

6

authorized to provide OBHS to beneficiaries. Through CSS, SPRUILL, had access to demographic information for large numbers of Medicaid beneficiaries. This information included, among other things, Medicaid Identification Numbers of beneficiaries.

17. Terry Lamont Speller was an individual who owned or controlled various Medicaid providers operating in the Eastern District of North Carolina that were authorized to bill Medicaid for OBHS and OHS.

18. Donnie Lee Phillips was a medical biller with knowledge and expertise concerning the billing of the Medicaid program for OHS and OBHS.

B. THE MEDICAL OFFICE AND DISTINCT ADVANTAGE BEHAVIOR HEALTH SERVICES

19. In or around 2013, Speller began to operate and control two adjacent and adjoined businesses at an office complex in Greenville, North Carolina. One business was referred to as "The Medical Office", while the other business was known as Distinct Advantage Behavior Health Services ("Distinct Advantage"). SPELLER held out Distinct Advantage as a nonprofit entity providing various outreach services to children and adults, while the Medical Office purported to be a provider of Outpatient Behavioral Health Services and Outpatient Health Services.

7

20. Due to prior Medicaid program disputes, Speller was unable to become a provider with the Medicaid program, and was unable to bill the Medicaid program directly for services. As such, Speller entered into an agreement with psychiatrist P.R., whereby P.R. believed that she would be providing medication management and follow up visits for patients brought to her by Speller at The Medical Office, and Speller would be handling the administration of the office, including billing. Under the agreement, Speller was to bill the Medicaid program only for services actually rendered by P.R. to Speller's patients. Speller agreed to pay P.R. a fixed monthly salary for providing services to the patients he recruited.

21. Speller consulted with SPRUILL concerning the establishment of The Medical Office. SPRUILL provided a logo and other business assistance to Speller concerning the operation of The Medical Office. Speller also contracted with Phillips to have Phillips bill the Medicaid program for services allegedly provided by P.R. and The Medical Office.

22. Unbeknownst to P.R., however, SPRUILL, Speller, and Phillips carried out a scheme whereby each would profit by using P.R. and The Medical Office to bill and cause Medicaid to be billed for services that P.R. did not provide.

8

23. Between January and May of 2013, Speller submitted documents to the Medicaid program directing that payments for services allegedly rendered by P.R. be wired into a bank account which appeared to be owned and controlled by P.R., but which was in fact a bank account for Distinct Advantage, which was owned and controlled by Speller. The documents purported to be signed by P.R., but were in fact forged by Speller.

24. Between July 11, 2013, and June 5, 2014, SPRUILL, Speller, and Phillips billed and caused Medicaid to be billed for numerous fraudulent claims for various Outpatient Health Services allegedly rendered by P.R. between January 1, 2013, and October 1, 2014. In fact, P.R. did not even begin to work at the Medical Office until October 2, 2013. Services were also fraudulently billed during the period after P.R. began to work at the Medical Office. In each instance, the claims reflected that P.R. had performed services covered under CPT Code 99215 when, in fact, P.R. did not perform the services, and no medical documentation existed to support such services. Each claim referenced in this paragraph also listed the Medicaid Identification Number of a patient who did not, in fact, receive the billed service.

25. SPRUILL participated directly in the aforementioned fraudulent billings to the Medicaid program by abusing his access

9

to hundreds of Medicaid Identification Numbers and patient names in the custody and control of CSS. Beginning in August of 2013, and continuing through May of 2014, SPRUILL transmitted lists of patient names to Speller and Phillips that were to be used to fraudulently bill the Medicaid program. Phillips did, in fact, use the information provided by SPRUILL to fraudulently bill the Medicaid program.

26. While carrying out the fraudulent billings scheme, SPRUILL, Speller, and Phillips regularly corresponded via phone concerning the amounts of fraudulent claims billed to Medicaid, the expected payment from Medicaid for these claims, and each participant's share of the fraudulent proceeds.

27. Following submission of the fraudulent claims, Medicaid routed payment for the fraudulent claims into Speller's Distinct Advantage bank account. Speller then paid Phillips and SPRUILL their share of the fraud proceeds via check. Speller and SPRUILL attempted to disguise the payments as loan repayments when, in fact, the checks were kickbacks constituting SPRUILL's share of the fraud proceeds.

28. In total, the Medicaid program disbursed $1,842,119.00 based upon fraudulent claim information supplied by SPRUILL to Speller and Phillips for use in the scheme.

## COUNT ONE
### *Conspiracy to Commit Health Care Fraud*
### *18 U.S.C. § 1349*

29. Introductory Paragraphs 1 through 28 are realleged and incorporated by reference into this Count.

### The Conspiracy

30. Beginning at a time unknown to the United States Attorney, but no later than January of 2013, and continuing through in or about June of 2015, within the Eastern District of North Carolina and elsewhere, the defendant SHEPHARD LEE SPRUILL, II, did knowingly combine, conspire, confederate, and agree with others known to the United States Attorney, to commit offenses against the United States, to wit, to knowingly and willfully execute and attempt to execute a scheme and artifice to: (1) defraud a health care benefit program, to wit, Medicaid, and (2) obtain by means of materially false and fraudulent pretenses, representations, and promises, any of the money or property owned by, and under the custody or control of said health care benefit program; in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

11

## Purpose of the Conspiracy

31. It was the purpose of the conspiracy for SPRUILL and other conspirators to benefit from the submission of claims to Medicaid for fictitious services.

## Overt Acts

32. In furtherance of the conspiracy, and to effect the objects thereof, there were committed in the Eastern District of North Carolina various overt acts, including, but not limited to the following:

a.) A member of the conspiracy supplied the names and Medicaid Identification Numbers of Medicaid beneficiaries to a Medicaid biller;

b.) A member of the conspiracy made false electronic claim transmissions to the Medicaid program using the Medicaid Identification Numbers of individuals who did not receive the billed services;

c.) A member of the conspiracy received the proceeds of the fraudulent claims billed to the Medicaid program;

d.) A member of the conspiracy divided the proceeds of the Medicaid fraud between the participants in the scheme.

All in violation of Title 18, United States Code, Section 1349.

12

## COUNT TWO
*Perjury*
## 18 U.S.C. § 1623

33. Introductory paragraphs 1 through 28 are realleged and incorporated herein as though fully set forth in this Count.

34. On or about June 3, 2015, in the Eastern District of North Carolina, SHEPHARD LEE SPRUILL, II, while under oath and testifying in a proceeding before a Grand Jury of the United States in the Eastern District of North Carolina, did knowingly make a false material declaration concerning his knowledge that Terry Lamont Speller and Donnie Lee Phillips were billing Medicaid for patient lists provided by SPRUILL, and splitting the Medicaid reimbursement proceeds between Speller and SPRUILL.

35. At the time and place aforesaid the Grand Jury was conducting an investigation into various fraudulent claims billed to Medicaid by providers controlled by Speller. Various Medicaid beneficiaries whose names and Medicaid Identification Numbers had been used in fraudulent billings were also used by Carolina Support Services to bill Medicaid. Bank records reflected that after a provider controlled by Speller billed Medicaid for the fraudulent services, the proceeds were split between Speller and SPRUILL, with a portion of the proceeds being paid to Phillips for transmitting the claims to Medicaid. SPRUILL was asked many

13

questions concerning the nature of any business connections between SPRUILL and Speller, and any overlap in billing services provided by Phillips to SPRUILL and Speller. SPRUILL characterized payments between Speller and himself only as loan repayments, rather than the splitting of Medicaid reimbursements.

36. At the time and place alleged, SPRUILL, appearing as a witness under oath at a proceeding before the Grand Jury knowingly made the following declarations in response to questions with respect to the material matter alleged in the preceding paragraph.

> Q: [Y]our testimony is that there's no business relationship between Carolina Support Services and ---
>
> A: There is no business relationship between myself and Terry Speller or any other alias that maybe he would go under. I saw Speller this and that, or the Medical Office, or whatever other aliases there - I've n - I have no business relationships with anything in regards to that, whether it's Carolina Support, Southern Support, Ultimate Support, Visions of New Hope, One to One, or Pride in North Carolina.

37. SPRUILL was also asked the following questions and gave the following answers:

> Q: I can also tell you that in connection with many of the payments that were made to you, the payments on the loans that you've talked about . . . there was a simultaneous payment to himself, Terry Speller, for the same amount in - near in time following a wire from

14

> Medicaid. So, Medicaid wires him funds, Mr.
> Speller comes to you with a check. He cuts a
> check to you for a certain amount, and he cuts
> a check to himself for the same amount. . . Do
> you know why that's occurring?

A: I do not.

Q: You have no knowledge of why that's occurring?

A: No, sir.

38. The aforesaid testimony of SHEPHARD LEE SPRUILL, II, as he then and there well knew and believed, was false, in that SPRUILL provided Medicaid patient lists to Speller to be billed through providers controlled by Speller, the proceeds from which were to be split, and were in fact split, between Speller and SPRUILL.

All in violation of Title 18, United States Code, Section 1623.

### FORFEITURE NOTICE

Upon conviction of the offense in Count One of the Information, the Defendant shall forfeit to the United States, pursuant to 18 United States Code, Section 982(a)(7) and 18 United States Code, Section 981 (a)(1)(C), the latter as made applicable by 28 U.S.C. Section 2641(c), any property constituting, or derived, directly or indirectly, as a result of said offense including, but not limited to a money judgment in the amount

15

Case 4:17-cr-00036-BO   Document 1   Filed 06/29/17   Page 15 of 16

equivalent to the gross proceeds of the offense.

If any of the above-described forfeitable property, as a result of any act or omission of the Defendant, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any property of said defendant up to the value of the forfeitable property described above.

JOHN STUART BRUCE
United States Attorney

BY: WILLIAM M. GILMORE
Assistant United States Attorney